**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF IOWA
CENTRAL DIVISION**

| | |
|---|---|
| FREDERICK ROZO, individually and on behalf of all others similarly situated, <br><br> Plaintiff, <br><br> vs. <br><br> PRINCIPAL LIFE INSURANCE COMPANY, <br><br> Defendant. | No. 4:14-cv-00463-JAJ <br><br> **ORDER** |

This matter comes before the Court pursuant to Defendant Principal Life Insurance Company's April 20, 2018 Motion for Summary Judgment pursuant to Federal Rule of Civil Procedure 56. Dkt. No. 187. Principal also filed a Motion to Exclude Opinions and Testimony of Richard Kopcke. Dkt. No. 186. Plaintiff Frederick Rozo, individually and on behalf of all others similarly situated, filed a Resistance to the Motion for Summary Judgment and a Motion to Exclude Opinions and Testimony of Craig Merrill on May 15, 2018. Dkt. Nos. 193, 194. Principal filed a Reply to Rozo's Resistance and a Motion to Decertify the Class on June 4, 2018. Dkt. Nos. 206, 207. Rozo filed an Opposition to Principal's Motion to Decertify the Class on June 22, 2018. Dkt. No. 215. Principal filed a Reply to Rozo's Opposition on June 29, 2018. Dkt. No. 221. For the reasons that follow, Defendant's Motion for Summary Judgment is **GRANTED** as to Counts I, II, and III. Accordingly, Plaintiff's Motion to Exclude Opinions and Testimony of Craig Merrill, Defendant's Motion to Exclude Opinions and Testimony of Richard Kopcke, and Defendant's Motion to Decertify the Class are **DENIED as moot**.

**I. STATEMENT OF UNDISPUTED MATERIAL FACTS[1]**

Plaintiff Frederick Rozo ("Rozo") resides in California and was employed by the Western Exterminator Company ("WEC").[2] During his employment, Rozo participated in the WEC Employees' 401(k) Profit Sharing Plan (the "Plan"), which allocated funds to the investment plan at issue in this lawsuit. Defendant Principal Life Insurance Company ("Principal") is an insurance company headquartered in Des Moines, Iowa. Principal offered a product called the Principal Fixed Income Option ("PFIO") to 401(k) plans. Participation in the PFIO is governed by a group annuity contract and incorporated schedules (the "Contract"). PFIO funds are deposited into Principal's general account, which is invested in bonds and fixed income instruments.

The PFIO is structured as a series of Guaranteed Interest Funds ("GIFs"). Every six months during the class period, Principal created a new GIF that accepted participants' deposits into the PFIO for the following six months.[3] For each GIF, Principal declared in advance an applicable Guaranteed Interest Rate ("GIR").[4] Accordingly, every six months during the class period, Principal issued a new PFIO schedule that related to and governed the new GIF. The interest rate credited to the participants is called the Composite Crediting Rate ("CCR"), and during the class period, Principal established a new CCR every six months, with effectivity dates of January 1 and July 1.[5] The PFIO Contract describes, in words, the formula used for calculating the CCR.[6] Participants are guaranteed to earn interest at the CCR for that six-month period—if Principal's general account performs at a rate of return less than the CCR, Principal will lose money by paying participants the CCR, but if the general account performs at a rate of

---

[1] Any alleged undisputed material facts not listed here were not necessary for the Court's analysis. Any necessary but disputed facts are noted as needed for later analysis.

[2] Unless otherwise noted, undisputed facts are taken from Docket Number 194-2, Plaintiff's Response to Defendant's Statement of Undisputed Facts; Docket Number 194-3, Plaintiff's Statement of Additional Material Facts; Docket Number 207-1, Defendant's Reply to Plaintiff's Response to Defendant's Statement of Undisputed Facts; and Docket Number 207-2, Defendant's Response to Plaintiff's Statement of Undisputed Fact. Undisputed facts are either: 1) undisputed by the parties; or 2) established by the pleadings, discovery materials, and affidavits.

[3] Rozo's discussion of GIFs outside the class period is irrelevant. *See* Docket Number 207-1 ¶ 6 (listing Principal's original statement of fact, Rozo's response, and Principal's reply). The remainder of Rozo's response does not dispute the fact stated by Principal.

[4] Rozo's response does not dispute the fact stated by Principal.

[5] Rozo's response contains irrelevant information from outside the class period and does not dispute the fact stated by Principal.

[6] Rozo's response states that the PFIO Contract does not describe the formulas used to calculate inputs present in the CCR formula. That does not dispute Principal's stated fact.

return above the CCR, Principal will make money by retaining the "spread."[7] Principal's ability to retain the spread is therefore dependent on participants' decision to invest in the PFIO.[8] Principal notifies plan sponsors of the new CCR about 30 days in advance of the new effectivity date. Plan sponsors (also called "plan administrators") are required by law to notify participants of the new rate.[9] If participants object to the new CCR, they can withdraw their monies subject to the terms described below.

The Contract governs the terms on which a plan or participant can withdraw from the PFIO.[10] Participants are allowed to withdraw their money from the PFIO at any time and deposit it in another plan investment option without a contractual financial penalty, though transfers to Competing Plan Investment Options are subject to an equity wash.[11] The Contract defines equity wash as follows, "any transfers made from this Contract to a Competing Plan Investment Option must first be directed to a Plan Investment Option that is not a Competing Plan Investment Option. There will be a stated period of time before such amounts may be directed to a Competing Plan Investment Option."[12] During all relevant times, Principal set the equity wash period at 90 days. In the fourth quarter of 2008, Rozo transferred $9,395 out of the PFIO and immediately placed those funds in non-competing investment options. Plans are allowed to terminate their entire interest in the PFIO either by giving Principal 12-month advance notice or by paying a 5% surrender charge to receive their funds immediately. If the plan chooses to pay the 5% surrender charge, the plan sponsor makes the decision as to whether or not to pass that charge along to participants. The Contract and related schedules also describe the "stampede provision," which states that if a collection of participant withdrawals appear to have been motivated by plan sponsor action, Principal can impose the surrender charge on the plan sponsor.[13] An inquiry into whether a stampede has occurred is triggered if participants representing 20% of the plan's interest in the PFIO withdraw within a three-month period and

---

[7] Rozo's response does not dispute the fact stated by Principal. While the Contract does not guarantee the CCR to be greater than zero, once the CCR is announced, it is a guaranteed rate of return on any monies invested in the PFIO for that six-month period.

[8] None of Rozo's responses credibly dispute this basic fact.

[9] 29 C.F.R. § 2550.404a-5(d)(1)(ii)(B); 29 C.F.R. § 2550.404a-5(i)(3).

[10] Rozo's response does not dispute the fact stated by Principal. *See* Dkt. No. 187-3, Contract at A_042–43; Dkt. No. 187-3, Schedule at A_055.

[11] Rozo's response does not dispute the fact stated by Principal. Further, potential or actual financial penalties for withdrawing funds imposed by means other than the Contract are not relevant to this case (i.e., tax penalties for early withdrawal).

[12] *See* Dkt. No. 187-3, Contract at A_036.

[13] Rozo's response does not dispute the fact stated by Principal.

the plan has given notice of its intent to withdraw.[14]

Article I of the Contract covers basic definitions; Article II details the deposits and funds; Article III of the Contract sets forth a description of Principal's fees with reference to the associated schedules; Article IV covers benefits and other payments; and Article V describes limitations and termination.

Additional undisputed material facts are set forth below as needed.

## II. LEGAL STANDARD FOR SUMMARY JUDGMENT

Federal Rule of Civil Procedure 56 provides that a "court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a); *see also Med. Liab. Mut. Ins. Co. v. Alan Curtis L.L.C.*, 519 F.3d 466, 471 (8th Cir. 2008); *Kountze ex rel. Hitchcock Found. v. Gaines*, 536 F.3d 813, 817 (8th Cir. 2008) ("[S]ummary judgment is appropriate where the pleadings, discovery materials, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to summary judgment as a matter of law."). In making this determination, the Court must examine the evidence in the light most favorable to the nonmoving party. *See HDC Med., Inc. v. Minntech Corp.*, 474 F.3d 543, 546 (8th Cir. 2007).

To survive a motion for summary judgment, a plaintiff must "set out specific facts showing a genuine issue for trial." FED. R. CIV. P. 56(e). "[A]n issue of material fact is genuine if the evidence is sufficient to allow a reasonable jury verdict for the nonmoving party." *Great Plains Real Estate Dev., L.L.C. v. Union Cent. Life Ins., et al.*, 536 F.3d 939, 944 (8th Cir. 2008) (internal citation omitted). "A genuine issue of fact is material if it 'might affect the outcome of the suit under the governing law.'" *Saffels v. Rice*, 40 F.3d 1546, 1550 (8th Cir. 1994) (internal citation omitted). "'[T]he substantive law will identify which facts are material.'" *Guinan v. Boehringer Ingelheim Vetmedica, Inc.*, 803 F. Supp. 2d 984, 993 (N.D. Iowa 2011) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). "The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Anderson*, 477 U.S. at 252.

---

[14] The Court notes that while the Contract and associated schedules establish that the stampede provision exists, neither party alleges that an actual stampede occurred with respect to this case.

## III. OVERVIEW OF THE PARTIES' ARGUMENTS

### A. Principal Life Insurance Company

Counts I and II of the First Amended Complaint allege that Principal breaches its fiduciary duty and engages in prohibited transactions under ERISA when it sets the fixed rate of return guaranteed to participants every six months. Count I states:

> These breaches include but are not limited to the following: (a) setting the Guaranteed Interest Rate and/or Composite Guaranteed Rate for its own benefit rather than for the benefit of the Plans and participants; (b) setting the credited rate artificially low; (c) misrepresenting the extent to which the rate was "guaranteed;" (d) failing to disclose its retention of the spread; and (e) charging an excessive disclosed fee in addition to the undisclosed compensation from the spread.

Dkt. No. 67. Count II states:

> Principal engaged in prohibited transactions in violation of ERISA § 406(b), 29 U.S.C. § 1106(b), by dealing with the Contract in its own interest or for its own account. Specifically, Principal set the credited rate to ensure its own profit rather than for the benefit of the Plans and participants, and set the rate artificially low.

Dkt. No. 67.

If Principal is not a fiduciary, Counts I and II fail as a matter of law. Principal argues it is not a fiduciary for two reasons. Dkt. No. 187. First, Principal announces each new rate in advance, which allows participants time to decide whether to accept or reject the new rate. Because participants decide whether each new rate will apply to their funds, Principal argues it lacks discretionary authority or control over plan assets sufficient to make it a fiduciary or set its own compensation. Second, Principal argues the PFIO is a guaranteed benefits policy ("GBP") under ERISA, which means that the assets allocated to the PFIO are not plan assets. If so, Principal lacks discretionary authority or control over plan assets sufficient to make it a fiduciary.

Count III alleges that Principal engages in a prohibited transaction by offering the PFIO and is liable under ERISA as a nonfiduciary party in interest. Count III states:

> Principal understood that it would receive millions of dollars in compensation from the Plans by retaining an excessive portion of the investment earnings derived from the Fund. Principal's failure to properly disclose this compensation caused the Plans to engage

> in transactions with Principal for the furnishing of services to the Plans, that are prohibited under ERISA § 406(a), 29 U.S.C. § 1106(a).

Dkt. No. 67. Principal argues that Count III fails because it lacked the requisite knowledge that the transaction was unlawful, which precludes the imposition of liability for a prohibited transaction. Dkt. Nos. 187, 207.

### B. Frederick Rozo and Class Members

First, Rozo argues that Principal acts as a fiduciary with respect to the PFIO. Dkt. No. 194-1 at 5–15. Rozo states that Principal's exercise of any discretionary authority over the management or disbursement of plan assets creates a fiduciary duty to participants because: (1) it directly affects the value of the Contract; and (2) it allows Principal to determine its own compensation. Further, Rozo argues that Principal need not have unilateral control or a final say over participants' ability to accept or reject the guaranteed rate for a fiduciary duty to exist. Finally, Rozo argues that there are genuine issues of material fact regarding participants' ability to "vote with their feet" by leaving the PFIO.

Second, Rozo argues that the guaranteed benefits policy ("GBP") exemption does not relieve Principal of fiduciary status. Dkt. No. 194-1 at 15–20. Rozo states that his claims pertain to Principal's administration of the Contract, which qualifies as a plan asset regardless of the GBP exemption. He also argues that the Contract is not a GBP because it does not guarantee any amount of benefits or a reasonable rate of return and the investment risk is borne primarily by the participants in the PFIO.

Third, Rozo argues that Principal was a party in interest upon entry into the Contract and engaged in prohibited transactions. Dkt. No. 194-1 at 20–25. Rozo states that Principal is strictly liable so long as it was aware of the details of the prohibited transactions and that he need not show Principal knew its conduct was illegal. In short, he argues that Principal's "singular" knowledge of its own compensation provides the requisite knowledge for Count III. Finally, Rozo claims he is entitled to a remedy for Principal's Section 406(a) violation.

### III. ANALYSIS AND CONCLUSIONS

The analysis and conclusions below address whether Principal is an ERISA fiduciary, and then whether Principal may still be liable as a nonfiduciary. ERISA states:

> Except as otherwise provided in subparagraph (B), a person is a fiduciary with respect to a plan to the extent (i) he exercises any

> discretionary authority or discretionary control respecting management of such plan or exercises any authority or control respecting management or disposition of its assets, (ii) he renders investment advice for a fee or other compensation, direct or indirect, with respect to any moneys or other property of such plan, or has any authority or responsibility to do so, or (iii) he has any discretionary authority or discretionary responsibility in the administration of such plan. Such term includes any person designated under section 1105(c)(1)(B) of this title.

29 U.S.C. § 1002(21)(A). Because the Court finds that Principal is not an ERISA fiduciary through its discretion as to the credited rate itself or as to its own compensation, it is unnecessary to analyze the parties' arguments regarding the Plan's status as a GBP. The Court notes, though, that even if the Plan is a GBP, "the only effect of the GBP exception, if it [applied], is to free the insurer from the requirement to manage its general account solely for the benefit of ERISA plan participants whose contributions reside in the general account." *Teets v. Great–West Life & Annuity Ins. Co.*, 286 F.Supp.3d 1192, 1200–01 (D. Colo. 2017).

### A. Fiduciary Status and Discretion as to the CCR

With regard to the first theory, the core of Principal's argument is that it is not a fiduciary because it announces each new rate in advance, which allows participants time to decide whether to keep their money in the PFIO or move it elsewhere. Principal relies on *Teets v. Great–West Life & Annuity Insurance Company* ("*Teets*"), which explains "there are a number of cases favoring the theory that a pre-announced rate of return prevents fiduciary status from attaching to the decision regarding . . . what rate to set, at least when the plan and/or its participants can 'vote with their feet' if they dislike the new rate." *Teets v. Great–West Life & Annuity Ins. Co.*, 286 F.Supp.3d 1192, 1201 (D. Colo. 2017). This line of cases begins with *Chicago Board Options Exchange, Inc. v. Connecticut General Life Insurance Company* ("*CBOE*"). Rozo, on the other hand, argues that the *Teets* decision is factually distinct[15] from the instant case and relies on a misinterpretation of *CBOE*. Dkt. No. 194-1 at 10 n.11. For the reasons listed below, the Court

---

[15] Specifically, Rozo notes that the PFIO has no guaranteed minimum interest rate, and the rate is contractually permitted to go below zero. Also, the product in *Teets* had no equity wash provision. Dkt. No. 194-1 at 6 n.4. While it is true that the PFIO has no guaranteed minimum and could theoretically drop below zero, the rate is announced in advance every six months, has never gone below zero during the class period, and participants have meaningful opportunities to leave the PFIO if the rate is unsatisfactory. Additionally, the equity wash provision does not destroy participants' meaningful opportunity to leave the PFIO, as illustrated by the fact that Rozo did remove his monies. Given these undisputed facts, *Teets* is sufficiently analogous to the instant case.

agrees with Principal and will apply the standard established in *CBOE* as described in *Teets*.[16]

In *CBOE*, the company announced a guaranteed rate of interest for its "Guaranteed Account" in advance. *Chicago Bd. Options Exch., Inc. v. Connecticut Gen. Life Ins. Co.*, 713 F.2d 254, 256 (7th Cir. 1983). Later, the insurance company exercised unilateral authority to amend the contract, forcing participants to transfer 10% of their contributions per year for the next 10 years into a new account called "Guaranteed Account B." *Id*. Under the contract, participants were forbidden from withdrawing funds after 10% of an account had been transferred or withdrawn in a single year. *Id*. The plaintiff sued, claiming that the insurance company had intentionally set up the second account to trigger the withdrawal provision and essentially freeze the funds for its own benefit. *Id*.

The plaintiff argued that the insurance company had breached its fiduciary duties under ERISA when it exercised unilateral control for its own benefit by amending the contract. *Id*. Holding that the plaintiff had a viable ERISA claim, the Seventh Circuit Court of Appeals observed a critical distinction:

> For our purposes the relevant question is whether the power to amend the contract constitutes the requisite "control respecting ... disposition of [plan] assets." Had *CBOE* simply given Plan assets to Connecticut General and said, "Invest this as you see fit and we will use the proceeds to pay retirement benefits," Connecticut General would clearly have sufficient control over the disposition of Plan assets and be a fiduciary under ERISA. *Because Connecticut General guaranteed the rate of return in advance for the Guaranteed Accounts, that is not the case here.* Nevertheless, the policy itself is a Plan asset, and Connecticut General's ability to amend it, and thereby alter its value, is not qualitatively different from the ability to choose investments. By locking *CBOE* into the Guaranteed Accounts for the next 10 years[,] Connecticut General has effectively determined what type of investment the Plan must make. In exercising this control over an asset of the Plan, Connecticut General must act in accordance with its fiduciary obligations.

*CBOE*, 713 F.2d at 260 (citations omitted) (emphasis added). The italicized language is important for two reasons. First, the Seventh Circuit Court of Appeals states that because the

---

[16] Rozo also argues that the exercise of *any* discretionary authority or control over management or disposition of plan assets confers fiduciary status and the existence of *any* barrier to rejecting a service provider's decision at the plan-level imposes fiduciary liability. See Dkt. No. 194-1 at 5–15. The Court is persuaded by the legal authority as presented in this Order.

insurance company announced the rate of return in advance, it is excused from fiduciary liability. Second, the Court of Appeals finds that discretion over a pre-announced rate of return "is not equivalent to amending the contract, nor qualitatively the same as the ability to choose investments." *Teets*, 286 F.2d at 1202.

Rozo argues that *CBOE* stands for the proposition that, "where a contract reserves to an insurer or other entity the authority to alter the value of the contract, the entity is a fiduciary with respect to the exercise of that authority." Dkt. No. 194-1 at 6. He further argues that "[t]he critical question is not whether the alleged fiduciary announces its decisions in advance, but whether its decisions are discretionary. *Id*. at 10 n.11. Both interpretations ignore the plain language of *CBOE*. First, the Court of Appeals makes an explicit distinction between decisions altering the value of the contract and a guaranteed rate of return that is announced in advance. Second, that explicit distinction means that the critical question is, in fact, whether a guaranteed rate of return is announced in advance.

Multiple other factually similar cases rely upon or expand *CBOE*'s distinction. In *Zang v. Paychex, Inc.*, the court found that because the investor received sixty days' notice of proposed changes, "it remained up to [the investor] to decide which funds to invest in"—even though the only meaningful way to reject the proposed options was to terminate the agreement at issue. *Zang v. Paychex, Inc.*, 728 F.Supp.2d 261, 270–71 (W.D.N.Y. 2010). In *Charters*, the court held that a meaningful opportunity to reject a proposed option or decision can defeat fiduciary status. *Charters v. John Hancock Life Ins. Co.*, 583 F.Supp.2d 189 (D. Mass. 2008) (concluding insurance company was a fiduciary because the opportunities to reject its unilateral substitution of investment options were not meaningful—in order to reject the substitution, the plan sponsor would have had to terminate its relationship with the insurance company and be subject to a termination fee and multiple administrative charges).

Similarly, courts have placed importance on whether the exercise of final authority on investment decisions is the product of arms-length negotiation. In *McCaffree*,[17] the Eighth

---

[17] Rozo argues Principal's reliance on *McCaffree* is inapposite because the plaintiffs were trustees rather than participants. Essentially, Rozo argues that ERISA is intended to protect participants and that absolving an investment provider of fiduciary status because participants are able to withdraw their monies "improperly places the onus entirely on participants to protect themselves" and places them on equal footing with service providers or plan fiduciaries. The Court is not persuaded. *McCaffree* is cited to support the proposition that a service provider's adherence to a properly-negotiated agreement with a plan administrator does not implicate fiduciary duty on behalf of the service provider. This proposition is equally true as to a trustee or a participant. Dkt No. 194-1 at 9–10. "Plan participants' 'veto authority' is . . . as relevant as plan sponsors' authority." *Teets*, 286 F.Supp.3d at 1204.

Circuit Court of Appeals stated, "a service provider's adherence to its agreement with a plan administrator does not implicate any fiduciary duty where the parties negotiated and agreed to the terms of that agreement in an arm's-length bargaining process." *McCaffree Fin. Corp. v. Principal Life Ins. Co.*, 811 F.3d 998, 1003 (8th Cir. 2016). "This makes sense: when a service provider and a plan trustee negotiate at arm's length over the terms of their agreement, discretionary control over plan management lies not with the service provider but with the trustee, who decides whether to agree to the service provider's terms." *Santomenno ex rel. John Hancock Tr. v. John Hancock Life Ins. Co. (U.S.A)*, 768 F.3d 284, 293 (3d Cir. 2014). Further, a fiduciary duty does not attach so long as one party remains "free to reject [the other party's] terms and contract with an alternative service provider offering more attractive pricing or superior investment products." *McCaffree*, 811 F.3d at 1003. In *Hecker*, the Seventh Circuit Court of Appeals held that where the employer had final say on which investment options would be included, the investment firm did not have "discretionary control sufficient for fiduciary status." *Hecker v. Deere & Co.*, 556 F.3d 575, 584 (7th Cir. 2009).

The court in *Insinga v. United of Omaha Life Ins. Co.*[18] summarized the analysis as it has evolved since *CBOE*:

> Thus, the question is whether United's monthly declaration of the new Guaranteed Interest Rate is merely a term of the Contract or the discretionary ability to change the terms of the Contract.
> 
> The Court concludes that United does not change the terms of the Contract when it declares a new Guaranteed Interest Rate every month. The Plan entered into the Contract to gain, among other options, the chance to invest money into an account where the interest is guaranteed. The Plan received that exact benefit. The interest rate is declared before any investments into a Maturity Account are made by the Plan. If the Plan determines that the declared interest rate is too low, it has full discretion to invest in a different fund. The appropriate amount of interest to guarantee is a fact-intensive question requiring careful monitoring of the current state of the market. Because of the market's constant fluctuations, fixing an exact interest rate or methodology into the terms of a contract would be almost impossible. . . .
> 
> United setting the Guaranteed Interest Rate did not change

---

[18] Rozo states that the court in *Insinga* made an improper factual inference in favor of the defendant and urges this Court to follow the summary judgment standard by construing all factual inferences in the light most favorable to him as the nonmoving party. The Court agrees that is the appropriate standard for summary judgment. Rozo does not otherwise challenge *Insinga*'s rationale.

10

> the Contract, nor did United exercise any other ability to change the contractual terms here. Simply put, United does not become a fiduciary by declaring the monthly Guaranteed Interest Rate.

*Insinga v. United of Omaha Life Ins. Co.*, 2017 WL 6884626, at *3 (D. Neb. Oct. 26, 2017) (This plan included an equity wash provision that required "a transfer from the Maturity Account to a competing fund to be held for at least 90 days in a non-competing investment option.") "Thus, if all the circumstances of the alleged ERISA-triggering decision show that the defendant does not have power to force its decision upon an unwilling objector, the defendant is not acting as an ERISA fiduciary with respect to that decision." *Teets*, 286 F.Supp.3d at 1204.

Here, the undisputed facts show that Principal is not acting as a fiduciary with respect to its ability to set the CCR. First, Principal is acting pursuant to the PFIO Contract, which is the result of an arms-length bargaining process with the plan sponsors. Until they sign the Contract, plan sponsors are free to choose another investment firm or not offer investment services at all. Participants, in turn, choose whether to invest subject to the terms of the Contract—they could choose not to invest at all or to retain private investment services separate from those offered by the plan sponsor. Second, Principal announces the GIR and CCR in advance and communicates those rates to plan sponsors. Plan sponsors are required by law to communicate those rates to participants. The overwhelming weight of authority indicates that announcing the rate in advance forestalls fiduciary responsibility under ERISA.

Finally, participants have a meaningful opportunity to "vote with their feet" by leaving the PFIO in response to an objectionable CCR set by Principal. At the participant level, there are no contractual fees or penalties for transferring funds to a non-competing fund. Transferring funds to a competing fund does trigger a 90-day equity wash, similar to that present in *Insinga*. The equity wash is described in the Contract, which participants agree to prior to making their decision to invest in the PFIO. The requirement of a short equity wash period, especially when included in an investment contract, does not obviate the meaningfulness of a participant's ability to leave the PFIO. At the plan level, plan sponsors are free to leave without any penalties if they provide 12-month notice to Principal (subject to the stampede provision), but they are subject to a 5% surrender charge if they do not provide notice. These restrictions are not as severe as those in *Charters*, where the Court held that fiduciary liability did attach because the only way to reject the service provider's decision was to terminate the entire relationship and be subject to

termination and administrative charges. Here, while there are restrictions included in the Contract at the plan level, they do not pose such a bar to leaving the PFIO that plan sponsors do not have a meaningful way to reject Principal's rate-setting decisions.

Therefore, the Court rejects Rozo's argument that it may hold Principal to fiduciary standards under the theory that Principal exercises discretionary authority when it sets the CCR and the GIR.

### B. Fiduciary Status and Discretion as to Defendant's Own Compensation

Next, Rozo argues, "Principal's ability to set a new GIR every six months also gives Principal authority over the amount of its own compensation, because Principal retains the spread between the rate paid to participants and the return on the underlying investment portfolio." Dkt. No. 194-1 at 8–9. It is correct that the agreement for an ERISA-covered plan may give a person or entity, "such control over factors that determine the actual amount of its compensation that the person thereby becomes an ERISA fiduciary with respect to that compensation." *F.H. Krear & Co. v. Nineteen Named Trustees*, 810 F.2d 1250, 1259 (2d Cir. 1987) (citing *Sixty-Five Sec. Plan v. Blue Cross & Blue Shield,* 583 F.Supp. 380, 387–88 (S.D.N.Y.1984)).

However, as recognized in *Teets*, "it appears this principle has only been applied in cases where the alleged fiduciary has some form of direct contractual authority to establish its fees and other administrative charges, or has authority to approve or disapprove the transactions from which it collects a fee. *Teets*, 286 F.Supp.3d at 1205–06; *see Pipefitters Local 636 Ins. Fund v. Blue Cross and Blue Shield of Michigan*, 722 F.3d 861, 867 (6th Cir. 2013) (describing situation in which insurer had total discretion as to collection mechanism to pay a state-mandated fee with plan monies); *Abraha v. Colonial Parking, Inc.*, 243 F.Supp.3d 179, 186 (D.D.C. 2017) (holding that use of contractual authority to change from a flat per-participant fee to a percentage-of-contributions fee amounted to discretion over service provider's own compensation, thus triggering ERISA's fiduciary obligations); *Golden Star, Inc. v. Mass Mut. Life Ins. Co.*, 22 F.Supp.3d 72, 80–81 (D. Mass. 2014) (explaining that contract granted insurer discretion to set a "management fee" between zero and 1% but noting existence of fact question as to whether it ever exercised such discretion); *Glass Dimensions, Inc. ex rel. Glass Dimensions, Inc. Profit Sharing Plan & Tr. v. State St. Bank & Tr. Co.*, 931 F.Supp.2d 296, 304 (D. Mass. 2013) (finding that bank had discretionary authority to set a "lending fee" ranging from zero to 50%);

*Charters*, 583 F.Supp.2d at 197 (holding that insurer was a fiduciary because it had complete discretion, subject to a set cap, to set an "administrative maintenance charge"); *Sixty–Five Sec. Plan v. Blue Cross & Blue Shield*, 583 F.Supp. 380, 387–88 (S.D.N.Y. 1984) (describing that because insurer's compensation was a percentage of claims paid and insurer had discretion whether to pay a claim, insurer was a fiduciary with regard to its own compensation).

The Court is persuaded that the undisputed facts show that Principal does not control its own compensation in the manner described above. Further, it is self-evident that Principal cannot control its own compensation through retaining the spread because ultimately its compensation is based on how many people invest in the PFIO. In sum, the undisputed facts show that:

> Principal offers a new rate every six months that it hopes will be acceptable to enough participants. It also hopes that it manages its general account funds well enough to make a profit. Principal is no different than any vendor in the market: it decides the terms on which to make its product available, but cannot compel any customer to choose its product or ensure that it will manage its investments well enough to earn a profit. Principal does not control its compensation.

Dkt. No. 187-1 at 18 (citing *Insinga*, 2017 WL 6884626, at *4 (insurance company that sets rate in advance on investment product does not set its own compensation because "[u]ltimately, the Plan and its participants determine how much investment is made," and the insurer "has no mechanism for controlling the market rate of return"); *see also Teets*, 286 F.Supp.3d at 1205–06 (finding that the ability to influence possible margins if plans and participants invest in a fund at the guaranteed rate is not enough to confer fiduciary responsibility when the rates are announced in advance and participants can reject a proposed rate before it applies).

Therefore, the Court rejects Rozo's argument that it may hold Principal to fiduciary standards under the theory that Principal sets its own compensation.

For the reasons stated above, Counts I and II fail as a matter of law and Principal is entitled to summary judgment.

### C. Nonfiduciary Liability

At the outset, the Court notes that this section of Rozo's brief contains few citations to the factual record and the argument appears to be largely legal rather than factual.[19]

---

[19] Rozo's arguments regarding nonfiduciary liability run from pages 20 through 25. He cites to the Statement of Additional Material Facts four times. First, for the correct proposition that Principal became a party in interest when it signed the contract. SAMF ¶ 5 Second, in support of his assertion that there is a disparity between the

### 1. Legal Standard

Even though Principal is not an ERISA fiduciary, it may still be liable as a nonfiduciary "party in interest"[20] that is "providing services to" an employee benefit plan. 29 U.S.C. § 1002(14)(B); *see* 29 U.S.C. § 1106(a)(1)(D) ("A fiduciary with respect to a plan shall not cause the plan to engage in a transaction, if he knows or should know that such transaction constitutes a direct or indirect . . . transfer to, or use by or for the benefit of a party in interest, of any assets of the plan[.]"). However, nonfiduciary parties in interest are not liable under ERISA unless they meet the heightened standard described in *Harris Trust & Savings Bank v. Salomon Smith Barney, Inc.* ("*Salomon*"). *Harris Tr. & Sav. Bank v. Salomon Smith Barney, Inc.*, 530 U.S. 238, 251 (2000). In *Salomon*, the Supreme Court held that a nonfiduciary party in interest may be liable under ERISA for a prohibited transaction if it had "actual or constructive knowledge of the circumstances that rendered the transaction unlawful." *Id.* at 251. A fiduciary, on the other hand, may be liable under ERISA for knowledge of "facts satisfying the elements of a [prohibited] transaction." *Id.*

The court in *Teets* presented an exhaustive review of the standard established in *Salomon*. *Teets*, 286 F.Supp.3d at 1206–09. In *Teets*, the court explained the difference between the standards for fiduciaries and nonfiduciary parties in interest:

> As to a plan fiduciary, "facts satisfying the elements of a [prohibited] transaction" seems plainly aimed at requiring only a knowledge of basic facts, particularly that the party in interest will use plan property for its own gain. . . . But, as to a nonfiduciary party in interest, the standard is "circumstances that rendered the transaction unlawful." Particularly in contrast to the fiduciary standard, this language appears aimed at exploring not just knowledge of the underlying facts, but knowledge of their potential unlawfulness. Indeed, the Supreme Court announced this standard specifically in the context of noting the limits of third-party liability.

*Teets*, 286 F.Supp.3d at 1208.[21] This heightened showing for a nonfiduciary party in interest "is

---

compensation Principal disclosed to plans and participants and the compensation it was aware it made. SAMF ¶¶ 143, 147, 155 Third, to dispute Principal's "outlandish claim that there were no prohibited transactions because Plan-level fiduciaries did not cause the Plans to transact with Principal, Participants did." SAMF ¶¶ 3–4 Fourth, to draw attention its expert, Dr. Richard Kopcke. SAMF ¶ 156

[20] Principal was not a party in interest until it entered into a contract with the Plan, but once the Contract was signed, it became a service provider to the plan and a party in interest. *See McCaffree*, 811 F.3d at 1003–04.

[21] The full text of the relevant passage is:

also consistent with the treatises the Supreme Court relied upon in *Salomon* to conclude that such parties may be liable in some circumstances." *Id*. at 1209 (citing *Salomon*, 530 U.S. at 250–51 (analyzing treatises); *id*. at n.10 ("The Third Restatement, which was published after *Salomon*, is even more direct on these points."); *cf. Kundson*, 534 U.S. at 217 (endorsing many of the same treatises as guides to determining whether a form of relief is legal or equitable)).

*Teets* summarized the difference between the required showings with an example. *Teets*, 286 F.Supp.3d at 1208–09. "As against a plan fiduciary . . ., it appears it would be enough to prove the fiduciary's actual or constructive knowledge that Defendant retains Fund-generated margin for itself." *Id*. But, as to nonfiduciary parties in interest, *Salomon* requires that a defendant have "actual or constructive knowledge of the circumstances" making the retention of the margin unlawful. *Id*. (noting that the court presumed allowing the defendant to retain the margin was a prohibited transaction because Defendant failed to contest that claim) (quoting *Salomon*, 530 U.S. at 251).

Rozo argues that *Teets* wrongly interpreted *Salomon*[22] and relies instead on *Neil v. Zell*. *Neil v. Zell*, 753 F.Supp.2d 724, 731 (N.D. Ill. 2010). The Court finds it noteworthy and persuasive that Rozo does not provide any explanation as to why *Teets* was wrongly decided, nor does he challenge numerous cases supporting the heightened standard for nonfiduciary parties in interest. In *Neil*, the court refuses to impose a scienter requirement on prohibited transactions as governed by 29 U.S.C. § 1106 and "agrees with Plaintiffs that they need only show that [Defendant] had actual or constructive knowledge of the deal's details." *Id*. The court also stated, "The standard for establishing fiduciary duty liability cannot be higher than the standard for liability for a nonfiduciary." *Id*. *Neil* effectively levels the playing field between fiduciaries and

---

> It also bears emphasis that the common law of trusts sets limits on restitution actions against defendants other than the principal "wrongdoer." Only a transferee of ill-gotten trust assets may be held liable, and then only when the transferee (assuming he has purchased for value) knew or should have known of the existence of the trust and the circumstances that rendered the transfer in breach of the trust. Translated to the instant context, the transferee must be demonstrated to have had actual or constructive knowledge of the circumstances that rendered the transaction unlawful. Those circumstances, in turn, involve a showing that the plan fiduciary, with actual or constructive knowledge of the facts satisfying the elements of a [29 U.S.C. § 1106(a)] transaction, caused the plan to engage in the transaction.

*Salomon*, 530 U.S. at 251, 120 S.Ct. 2180 (emphasis in original).

[22] Dkt. No. 194-1 at 22 n.22. *Teets* is no longer on appeal and the order of the district court stands.

nonfiduciary parties in interest. Principal cites multiple cases in addition to *Salomon* and *Teets* supporting the rule that a nonfiduciary can only be held liable if it knew or should have known the transaction violated ERISA.[23] Dkt. No. 27 at 13–14, n.5.

For the reasons detailed above, this Court is persuaded by *Teets*' interpretation of the standard established in *Salomon*. Further, *Neil* is distinguishable on the grounds that it was evaluating a fiduciary's culpability rather than a nonfiduciary party in interest. *Id*. at 726; *see also Mejia v. Verizon Mgmt. Pension Plan*, 2012 WL 1565336, at *12 (N.D. Ill. May 2, 2012). "Accordingly, an ERISA plaintiff cannot rely solely on the knowledge that would satisfy a fiduciary's liability for a prohibited transaction to likewise hold a nonfiduciary party in interest liable for that transaction. Rather, the plaintiff must show that the defendant knew or should have known that the transaction violated ERISA." *Teets*, 286 F.Supp.3d at 1209.

### 2. Burden of Proof

Rozo argues that Principal bears the burden of proof on the issue of whether or not the alleged violation of 29 U.S.C. § 1106 falls under an exception present in 29 U.S.C. § 1108 because generally defendants in ERISA actions are in possession of the information to know whether an exception applies. Dkt. No. 194-1 at 21 (citing *Fish v. GreatBanc*, 749 F.3d 671, 685–86 (7th Cir. 2014); *Allen v. GreatBanc Tr. Co.*, 835 F.3d 670, 676 (7th Cir. 2016); *Braden v. Wal-Mart Stores, Inc.*, 588 F.3d 585, 601 n.10 (8th Cir. 2009)). *Fish*, *Allen*, and *Braden* all state that a *fiduciary* should bear the burden of proof as to whether a prohibited transaction falls under an exception. *Fish*, 749 F.3d at 685–86; *Allen*, 835 F.3d at 676; *Braden*, 588 F.3d at 601 n.10.

---

[23] Principal's full citation is as follows:
> Numerous other court have agreed. *See Diduck v. Kaszycki & Sons Contractors, Inc.*, 974 F.2d 270, 282-83 (2d Cir. 1992) ("The relevant 'knowledge' for liability to attach for knowingly participating in a fiduciary's breach of duty is knowledge as to the primary violator's status as a fiduciary and knowledge that the primary's conduct contravenes a fiduciary duty."), *abrogated on other grounds by Bricklayers & Allied Craftworkers Local 2, Albany, N.Y. Pension Fund v. Moulton Masonary & Constr., LLC*, 779 F.3d 182 (2d Cir. 2015); *Kalan v. Farmers & Merchs. Tr. Co.*, No. 15-1435, 2016 WL 3087360, at *2 (E.D. Pa. June 2, 2016) ("Plaintiffs have failed to allege that [non-fiduciary] SAO had actual or constructive knowledge that funds rightfully belonging to an ERISA plan were wrongfully transferred to them."); *Carlson v. Principal Life Ins. Co.*, No. 01-CV-0581, 2006 WL 2806543, at *5 (E.D.N.Y. Sep. 28, 2006) (non-fiduciary must "have notice of any alleged breach"), *aff'd*, 259 F. App'x 365 (2d Cir. 2008); *Laborers' Pension Fund v. Arnold*, No. 00 C 4113, 2001 WL 197634, at *8 (N.D. Ill. Feb. 26, 2001) ("To state a claim under § 406(a) . . . Plaintiffs must allege . . . [the non-fiduciaries] knew that they received excessive compensation[.]").

Dkt. No. 207 at 13–14 n.5.

Principal argues that Rozo misstates the burden of proof because: 1) the cases cited all involve fiduciaries rather than nonfiduciary parties in interest; and 2) other courts have held that "plaintiff bears that burden in a claim against a nonfiduciary." Dkt. No. 207 at 14; *see Hans v. Tharaldson*, 2011 WL 7179644 at *16 (D. N.D. Oct. 31, 2011) (referencing plaintiff's "burden of establishing that the [defendant's actions] constituted a "prohibited transaction" under § 406" against nonfiduciary defendants); *Keach v. U.S. Trust Co., N.A.*, 256 F.Supp.2d 818, 821–22 (C.D. Ill. 2003).

The Court agrees with the burden of proof presented in *Hans* and *Keach*. Rozo bears the burden of establishing Principal violated 29 U.S.C. § 1106 and that the violation was not encompassed by a 29 U.S.C. § 1108 exception.

### 3. Discussion and Conclusion

Rozo begins with the proposition that essentially any violation of ERISA § 406 (codified at 29 U.S.C § 1106) is a strict liability offense—once a contract is signed, *all* transactions between a service provider and a plan are prohibited unless subject to the exceptions in ERISA § 408 (codified at 29 U.S.C § 1108). *See* 29 U.S.C §§ 1106, 1108. Rozo alleges that "Principal used the Contract (which is a plan asset) on an ongoing basis to set the CCR, collect contributions, pay interest to plan participants at the CCR, and retain the spread [in violation] of ERISA § 406(a)." Dkt. 194-1 at 21. Specifically, he argues that Principal's actions are prohibited unless they fall within the exception allowing for the exchange of services for "no more than reasonable compensation." 29 U.S.C. § 1108(b)(2).

Rozo argues his entire case regarding nonfiduciary liability using the *Neil* version of the *Salomon* standard. Dkt. No. 194-1 at 21–24. Under the *Neil* standard, ERISA liability as a nonfiduciary party in interest would attach if Principal had "knowledge of the facts, events, conditions, or evidence" of its use of plan assets to provide services to the plan for unreasonable compensation. *Neil*, 753 F.Supp.2d at 731. Rozo states, "There can be no question that Principal was in possession of all the facts regarding its compensation. Indeed, Principal determined the deducts it applied to price the PFIO, and had all the necessary data and information to calculate the spread for each six-month period." Dkt. No. 194-1 at 23. Under *Neil*, Rozo would not have to show that Principal knew its use of the Contract "to set the CCR, collect contributions, pay interest to plan participants at the CCR, and retain the spread" violated ERISA § 406(a). It appears to the Court that Rozo's argument for the imposition of nonfiduciary liability upon

Principal boils down to an allegation that Principal engaged in prohibited transactions under ERISA by executing its assigned duties as described by the Contract without knowledge that using the Contract to perform those duties was unlawful because its compensation—also detailed in the Contract—was unreasonable. Because of his reliance on *Neil*, Rozo does not explain how Principal knew or should have known its use of the Contract was unlawful. Dkt. No. 194-1 at 20–25. Further, Rozo repeatedly emphasizes a perceived disparity in the information held by the parties regarding Principal's compensation without explaining how this alleged fact contributes to Principal's knowledge that its conduct was unlawful. *Id*. at 24.

As reflected in its reply brief, Principal's most persuasive argument is that Rozo simply has not made out a claim for nonfiduciary liability under the *Salomon* standard as articulated in *Teets*. Dkt. No. 187-1 at 19–20; Dkt. No. 207 at 13–15. Using Rozo's description, the undisputed facts show that "Principal used the Contract (which is a plan asset) on an ongoing basis to set the CCR, collect contributions, pay interest to plan participants at the CCR, and retain the spread." Dkt. No. 194-1 at 21. Applying the rationale from *Salomon* and *Teets*, Rozo needs to show that Principal knew or should have known that the transaction violated ERISA. Even if engaging in a prohibited transaction is a strict liability offense, Rozo "has not presented any evidence that Principal *knew* its compensation was unreasonable. The fact that [Rozo's] expert claims the compensation is unreasonable does not mean Principal thought it was unreasonable." Dkt. No. 207 at 14–15. Given that Principal's duties and the methods of calculating its compensation were agreed-upon terms of the Contract, Principal had no reason to think its compensation was anything other than reasonable.

The Court finds that the undisputed material facts demonstrate that Principal neither knew nor should have known that it was engaging in an unlawful prohibited transaction under ERISA. Count III fails as a matter of law and Principal is entitled to summary judgment. Because the Court finds that Rozo's argument to impose nonfiduciary liability on Principal as party in interest is without merit, the Court does not reach the questions presented by Rozo's request to recover. Dkt. No. 194-1 at 24–25; *see also Teets*, 286 F.Supp.3d at 1207 (awarding summary judgment on other grounds and therefore not reaching the issue of remedies).

## IV. CONCLUSION

The Court finds that the undisputed facts show: 1) Principal is not acting as an ERISA fiduciary when its sets the CCR and the GIR; 2) Principal is not acting as an ERISA fiduciary

with regard to its own compensation; and 3) Principal neither knew nor should have known that it was engaging in an unlawful prohibited transaction under ERISA. For the reasons stated above, all three counts fail as a matter of law and Principal is entitled to summary judgment.

Upon the foregoing,

**IT IS ORDERED** that Defendant's Motion for Summary Judgment is **GRANTED** as to Counts I, II, and III.  **IT IS FURTHER ORDERED** that Plaintiff's Motion to Exclude Opinions and Testimony of Craig Merrill, Defendant's Motion to Exclude Opinions and Testimony of Richard Kopcke, and Defendant's Motion to Decertify the Class are **DENIED.** The Clerk shall enter judgment in favor of the defendant.

**DATED** this 25th day of September, 2018.

_____
JOHN A. JARVEY, Chief Judge
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF IOWA