# United States Court of Appeals
## For the Eighth Circuit

_____

No. 21-2026
_____

Frederick Rozo

*Plaintiff - Appellant*

v.

Principal Life Insurance Company

*Defendant - Appellee*

------------------------------

Chamber of Commerce of the United States of America; American Benefits Council; American Council of Life Insurers

*Amici on Behalf of Appellee*
_____

Appeal from United States District Court
for the Southern District of Iowa - Central
_____

Submitted: May 12, 2022
Filed: September 2, 2022
_____

Before SMITH, Chief Judge, COLLOTON and SHEPHERD, Circuit Judges.
_____

SMITH, Chief Judge.

Principal Life Insurance Company (Principal) offers a product called the Principal Fixed Income Option (PFIO), a stable value contract, to employer-sponsored 401(k) plans. Frederick Rozo, on behalf of himself and a class of plan participants who deposited money into the PFIO, sued Principal under the Employee Retirement Income Security Act of 1974 (ERISA), claiming that it (1) breached its fiduciary duty of loyalty by setting a low interest rate for participants and (2) engaged in a prohibited transaction by using the PFIO contract to make money for itself. The district court[1] granted summary judgment to Principal after concluding that it was not a fiduciary. This court reversed, holding that Principal was a fiduciary. *See Rozo v. Principal Life Ins. Co.*, 949 F.3d 1071 (8th Cir. 2020). On remand, the district court entered judgment in favor of Principal on both claims after a bench trial. Rozo challenges the court's judgment. We affirm.

I. *Background*

In a typical employer-sponsored 401(k) plan, the sponsor assembles a menu of options for participants to choose from to place their retirement savings. The PFIO is one of those options. It is a general-account backed group annuity contract that consists of a series of "Guaranteed Interest Funds" (GIFs). During the class period—from 2008 to November 2020—Principal created a new GIF every six months and set the maturity for each at ten years. After a new GIF was created, a portion of the money in each existing GIF was rolled forward into the new GIF. When Principal created a new GIF, it determined for that GIF a "Guaranteed Interest Rate" (GIR). Each GIR is fixed for the GIF's ten-year life. This guarantee is the PFIO's key feature; it makes the PFIO attractive to participants who want to predictably grow their retirement savings.

---

[1] The Honorable John A. Jarvey, then Chief Judge, United States District Court for the Southern District of Iowa, now retired.

Principal sets GIRs by subtracting "deducts" from the return it expects to earn on assets that it holds. Deducts are Principal's predictions about future risks and costs that it will bear in connection with guaranteeing future payment over a GIF's ten-year life. Principal receives no fee for offering the PFIO; its only compensation is the positive spread, if any, between the amount it promises to credit participants and the amount its investments actually yield. Principal used 14 deducts to determine the PFIO's GIRs. The higher the amounts of the deducts, the less participants earn and the more Principal makes. Over the class period, Principal reduced its deducts by roughly 33 percent.

Participants earn interest at the "Composite Crediting Rate" (CCR), a weighted average of all the GIRs. The CCR changes every six months when Principal establishes a new GIF and GIR. Plan sponsors and participants are notified of each new CCR before it takes effect. The CCR was between 1.10 percent and 3.50 percent during the class period.

Rozo brought his claims under 29 U.S.C. §§ 1104(a)(1)(A) and 1106(b)(1). Section 1104(a)(1)(A) requires "a fiduciary [to] discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries and—(A) for the exclusive purpose of: (i) providing benefits to participants and their beneficiaries; and (ii) defraying reasonable expenses of administering the plan." Section 1106(b)(1) prohibits a fiduciary from "deal[ing] with the assets of the plan in his own interest or for his own account."

Principal moved (1) to exclude the opinions and testimony of one of Rozo's experts, (2) to decertify the class, and (3) for summary judgment. Rozo moved to exclude the opinions and testimony of one of Principal's experts. The district court concluded that Principal is not a fiduciary, granted summary judgment, and denied the three other motions as moot. This court reversed and remanded, holding that Principal acted as a fiduciary when it set the CCR. *See Rozo*, 949 F.3d at 1075–76.

On remand, the district court held a bench trial in November 2020. The district court made findings concerning nine deducts that Rozo challenged. Of those deducts, five are at issue here: (1) the Surplus & Federal Income Taxes (FIT) deduct, (2) the Additional Surplus deduct, (3) the Standard Expense Support (SES) deduct, (4) the Full Service Accumulation (FSA) Pricing Support deduct, and (5) the Retirement and Income Solutions (RIS) Risk Management deduct. The court found that those deducts were reasonable and that they represented Principal's reasonable expenses of administering the PFIO.

On the disloyalty claim, the court first determined that "participant[s] . . . ha[ve] an interest in payment of reasonable expenses of administering the plan" based on the language of the statute, § 1104(a)(1), and that they have an interest in the "soundness and stability" of the PFIO. *Rozo v. Principal Life Ins. Co.* (*Dist. Ct. Op.*), No. 4:14-CV-00463-JAJ, 2021 WL 1837539, at *15 (S.D. Iowa Apr. 8, 2021). It concluded "that Principal's determination of the deducts . . . properly served the interest of the participants." *Id*. (internal quotation marks omitted). As to the CCR, it determined:

> It is in both the participants' and Principal's interest[s] to establish a CCR that will appropriately account for Principal's risks and costs in offering the PFIO, not just so that the product can remain competitive in the market, but so that Principal can make good on its guarantees to participants.

*Id*. at *18. The court concluded that Principal set the best CCR that it could for participants.

On the prohibited-transaction claim, the court first analyzed whether Principal engaged in self-dealing. It then determined whether Principal instead received "reasonable compensation for services rendered . . . in the performance of [its] duties with the plan." 29 U.S.C. § 1108(c)(2) (exemptions from prohibited transactions).

-4-

"[T]he court [found] that Principal's setting of the CCR was not dealing with the assets of the plan in Principal's own interest or for its own account." *Dist. Ct. Op.*, 2021 WL 1837539, at *22. It alternatively held that "even if Rozo could establish self-dealing . . . the court finds in Principal's favor on its 'reasonable compensation' defense." *Id*. at *23.

## II. *Discussion*

> After a bench trial, this court reviews legal conclusions de novo and factual findings for clear error. Under the clearly erroneous standard, we will overturn a factual finding only if it is not supported by substantial evidence in the record, if it is based on an erroneous view of the law, or if we are left with the definite and firm conviction that an error was made.

*Urb. Hotel Dev. Co. v. President Dev. Grp., L.C.*, 535 F.3d 874, 879 (8th Cir. 2008) (internal quotation marks and citation omitted).

### A. *Disloyalty Claim*

"To prevail on a claim of breach of fiduciary duty under ERISA, the plaintiff must make a prima facie showing that a defendant acted as a fiduciary, breached his fiduciary duties, and thereby caused a loss to the [p]lan." *Dormani v. Target Corp.*, 970 F.3d 910, 914 (8th Cir. 2020) (internal quotation marks omitted). The issue in this case is whether there was a breach. Rozo makes two arguments. First, he contends that the district court erred by holding that Principal did not breach its duty. Rozo avers "that Principal acted at least in part to advance its own interests, e.g., by increasing profit," and thus failed to act solely in participants' interests. Appellant's Br. at 23 (emphasis omitted). Second, he argues that the court clearly erred by finding that the deducts were reasonable and represented Principal's reasonable expenses of administering the PFIO.

Rozo contends that "if the fiduciary acts even 'in part' to further its own interests, it breaches its duty." *Id*. at 24–25 (citing *Tussey v. ABB, Inc.*, 850 F.3d 951,

-5-

957–58 (8th Cir. 2017); *Leigh v. Engle*, 727 F.2d 113, 129 (7th Cir. 1984); *Donovan v. Bierwirth*, 680 F.2d 263, 271 (2d Cir. 1982)). The authorities relied on by Rozo are distinguishable. In *Leigh*, the Seventh Circuit described a non-exhaustive list of "several factors . . . relevant in deciding whether the plan administrators acted solely in the interests of the plan beneficiaries." 727 F.2d at 127. The only factor applicable here is "the risk of conflicts between the interests of the fiduciaries and beneficiaries," which that court considered "the key warning signal for possible misuse of plan assets." *Id.*[2] *Leigh* and *Donovan*, however, both "involved the commitment of plan assets to corporate control contests in which the plan trustees' jobs were at stake." *Metzler v. Graham*, 112 F.3d 207, 213 (5th Cir. 1997). Those cases present much different scenarios from the one here.

In *Donovan*, the Second Circuit "accept[ed] the argument" that "despite the words 'sole' and 'exclusive', . . . officers or directors [who were also trustees of a company's pension plan] d[id] not violate their duties by following a course of action with respect to the plan which benefits the corporation as well as the beneficiaries." 680 F.2d at 271. It also set forth the standard that "[fiduciaries'] decisions must be made with an eye single to the interests of the participants and beneficiaries." *Id*. The Court also applies that standard but with the caveat that "incidental benefits . . . are not impermissible." *Hughes Aircraft Co. v. Jacobson*, 525 U.S. 432, 445 (1999) (rejecting retired employees' argument that their employer impermissibly benefitted because it lowered its labor costs after it "effectively increas[ed] certain employees'

---

[2]The other two factors are not applicable. The first—"whether fiduciaries with divided loyalties make an intensive and scrupulous investigation of the plan's investment options"—does not apply because Principal is not in a position to investigate investment options for plan participants. *Id*. It merely offers one of those options. The second—"the consistent management of plan assets in congruence with the fiduciaries' personal interests over a substantial period of time in control contests"—does not apply because this case does not involve a contest for control of a company. *Id*.

wages through either providing increased retirement incentives or including those employees in the [p]lan's noncontributory [benefit] structure").

In *Tussey*, we held that the company sponsor of multiple plans and its agents (collectively, the company) breached its duties because it removed "fund A" from the plans' menu of options and redirected investments from fund A to "fund B" in order to benefit the recordkeeper for the plans and the investment advisor for fund B. *See* 850 F.3d at 956–57. We rejected the company's argument that "some [evidence] . . . showed [the company] acting against [the interests of the recordkeeper and investment advisor] in various ways" because "[the company's] examples all relate[d] to other investment decisions, not the [fund] swap." *Id*. at 957. Rozo's contention that if a fiduciary acts even in part to further its own interests, it breaches its duty relies in part on our rejection of the company's argument in *Tussey*. Our rejection of that argument, however, does not support Rozo's contention. The facts are distinguishable. That case centered upon the company's fund swap. There are no similar facts in this case.

*Leigh* and *Donovan* provide some general guiding principles on conducting the breach-of-duty inquiry. But neither those cases nor *Tussey* involved a determination of whether a fiduciary breached its duty of loyalty by setting a certain interest rate for plan participants. Turning to more factually similar cases, some of our other sister circuits have recognized that "ERISA does not create an exclusive duty to maximize pecuniary benefits." *Collins v. Pension & Ins. Comm. of S. Cal. Rock Prods. & Ready Mixed Concrete Ass'ns*, 144 F.3d 1279, 1282 (9th Cir. 1998) (per curiam) (affirming grant of summary judgment for plan administrator; holding that it did not breach its duty by failing to increase benefits); *see also Foltz v. U.S. News & World Rep., Inc.*, 865 F.2d 364, 373–74 (D.C. Cir. 1989) (affirming judgment for employer; holding that the employer did not breach its duty by deciding to treat stocks that it bought back from retired employees as minority interests, even though that resulted in retired employees' stocks selling for less than the amount current employees' stocks were

later worth). The First Circuit has "balk[ed] at the notion that a fiduciary violates ERISA's duty of loyalty simply by picking 'too conservative' a benchmark for a stable value fund."[3] *Ellis v. Fid. Mgmt. Tr. Co.*, 883 F.3d 1, 9 (1st Cir. 2018) (affirming summary judgment for plan administrator).

In addition to the Seventh and Second Circuits, *see Leigh*, 727 F.2d 113; *Donovan*, 680 F.2d 263, other circuits have taken differing approaches. The Fourth Circuit's approach is to determine whether a substantial conflict of interest exists and, if so, scrutinize the fiduciary's actions more closely than when it acts solely in the beneficiaries' interests. *See Doe v. Grp. Hospitalization & Med. Servs.*, 3 F.3d 80, 87 (4th Cir. 1993), *abrogated on other grounds by Carden v. Aetna Life Ins. Co.*, 559 F.3d 256 (4th Cir. 2009). The Ninth Circuit considers the fiduciary's "state of mind"—chiefly, whether the fiduciary was "motivated by economic self-interest"—which it has determined to be a fact issue for the district court's resolution. *See Pilkington PLC v. Perelman*, 72 F.3d 1396, 1402 (9th Cir. 1995). The First and Fifth Circuits, respectively, also understand the duty of loyalty to "require . . . that the fiduciary not place its own interests *ahead* of those of the [p]lan beneficiary," *Vander Luitgaren v. Sun Life Assur. Co. of Canada*, 765 F.3d 59, 65 (1st Cir. 2014) (emphasis added), or "*over* the plan's interest," *Metzler*, 112 F.3d at 213 (emphasis added).

---

[3] "A stable value fund is a portfolio of bonds that are insured to protect the investor against a decline in yield or a loss of capital." Carol M. Kopp, *Stable Value Fund Defined*, Investmentopedia, https://www.investopedia.com/terms/s/stable-value-fund.asp (last updated July 31, 2020). The PFIO is a stable value contract. Both types of products "use[] investment contracts to help deliver the unique benefits for which stable value is known: capital preservation, liquidity, and steady, positive returns." Stable Value Inv. Ass'n, *What types of contracts are used in stable value funds?*, https://www.stablevalue.org/what-types-of-contracts-are-used-in-stable-value-funds/ (last updated July 23, 2021).

Our circuit has not set forth factors for determining whether plan administrators acted solely in participants' interests. "Whether . . . fiduciaries' actions constituted a breach is a legal question we must answer de novo." *Tussey*, 850 F.3d at 956. We conduct an inquiry similar to those of our sister circuits. In assessing whether a conflict of interest existed between Principal and the participants, we first determine each of the parties' interests. In determining the participants' interests, we find instructive the First Circuit's analysis of the stable value fund issue in *Ellis*. The participants here, like those in *Ellis*, have an interest in risk-averse "asset preservation." 883 F.3d at 9. The trade-off for risk avoidance is that they were "not to expect robust returns." *Id*. Principal, unpaid for offering the PFIO, is only compensated for any positive spread between what it promises to credit participants and what its investments actually yield. We agree with the district court "that there is tension between [the parties' interests], because the higher the deducts to the GIRs for the PFIO, the lower the rate paid to participants will be, while—with the exception of 'pass through' deducts—the higher the deducts, the higher Principal's revenue from the PFIO will be." *Dist. Ct. Op.*, 2021 WL 1837539, at *18. But that tension does not inevitably result in the type of conflict of interest that establishes a breach of the duty of loyalty. *See Grp. Hospitalization*, 3 F.3d at 87.

Because there is a conflict of interest, we scrutinize Principal's actions more closely, *see id*., and determine its state of mind when it set the PFIO's CCR, *Pilkington*, 72 F.3d at 1402. "[W]hat [the fiduciary] did, and why, are factual matters on which we accept the district court's findings unless they are clearly wrong." *Tussey*, 850 F.3d at 956. The district court determined that Principal set the CCR according to a shared interest with participants—"to establish a CCR that will appropriately account for Principal's risks and costs in offering the PFIO." *Dist. Ct. Op.*, 2021 WL 1837539, at *18. We agree that Principal and the participants share that interest because "a guaranteed CCR that is too high threatens the long-term sustainability of the guarantees of the PFIO, which is detrimental to 'the interest of the participants.'" *Id*.

The question then becomes whether the court clearly erred by finding that Principal set the CCR in participants' interests. The court found the following:

> The court [found] credible the testimony of Principal's witnesses that Principal's actuaries who reviewed the deducts "tr[ied] to set the best rate that [they could] for participants" while also appropriately accounting for Principal's anticipated costs and risks, to ensure Principal could make good on its obligation to pay participants the PFIO's guaranteed rate regardless of future market conditions. . . .
>
> [T]he primary support Rozo offers for his contention that the deducts were excessive is the testimony of his expert, Dr. Kopcke. . . . The court [found] his opinions wholly unpersuasive in light of the evidence of the reasonable—indeed, meticulous—process Principal used to determine the deducts. . . . [T]hat reasonable process provides an inference—here, a strong one—that Principal's motive was to act in "the interest of the participants."

*Id*. at *20 (second and third alterations in original). "When findings are based on determinations regarding the credibility of witnesses, [Fed. R. Civ. P.] Rule 52 demands even greater deference to the trial court's findings, and unless contradicted by extrinsic evidence or internally inconsistent, such findings can virtually never be clear error." *Adzick v. UNUM Life Ins. Co. of Am.*, 351 F.3d 883, 889 (8th Cir. 2003). We hold that the court did not clearly err in finding that the deducts, and thus the CCR, were set in participants' interests.

We also hold that the court did not clearly err by finding that the deducts were reasonable and set by Principal in the participants' interest of paying a reasonable amount for the PFIO's administration. First, the court found that the RIS Risk Management deduct was reasonable and a reasonable expense in the participants' interest. The court concluded:

-10-

> Principal's actuaries estimated this deduct through studies of its risk management activities and stochastic analyses of the potential market value losses associated with plan lapses (departures) for products with a 12-month put. Principal refined its analysis of the 12-month put risk to make it suitable for pricing and began to use that refined analysis to compute the RIS Risk Management deduct for future GIRs from 2015 onward.

*Dist. Ct. Op.*, 2021 WL 1837539, at *12.

Principal's RIS division did operate with a "profit objective[]" as Rozo alleged. Appellant's Br. at 26 (quoting Appellant's App'x at 285). But simply using that division's expertise did not show that Principal pursued a profit when it charged a reasonable fee for the use of those services to participants via the deduct. We hold that the court did not clearly err in its findings as to the RIS Risk Management deduct because that conclusion was supported by substantial evidence. *See Urb. Hotel*, 535 F.3d at 879. The record shows the following: (1) a financial analyst involved in the PFIO rate-setting process pre-2015 confirmed that Principal calculated what the annual charges of those services are, and (2) Principal documented those calculations and those documents were discussed at length at trial.

Second, Principal calculated the Surplus and FIT deduct to target a return of its own funds set aside to back the PFIO. The court found that Principal's target return rate of 15 percent to 20 percent was reasonable and a reasonable expense in the participants' interest, rejecting Dr. Kopcke's opinion that Principal should have aimed for a rate of 10 percent to 12 percent. The court's finding was not clearly erroneous.

Third, Principal implemented the Additional Surplus deduct after the 2008 financial crisis to increase the target rate in the Surplus and FIT deduct. It did so to address increased risks and costs of offering the PFIO. The court found that the deduct was reasonable and a reasonable expense in the participants' interest, rejecting

-11-

Dr. Kopcke's opinion that the deduct should have been eliminated because the Surplus and FIT deduct fully compensated Principal. As to both of those deducts, Rozo argues that Principal's target rate was higher than necessary because others in Principal's industry have gotten by with a lower rate. But as our sister circuits have held, "ERISA does not create an exclusive duty to maximize pecuniary benefits." *Collins*, 144 F.3d at 1282; *see also Foltz*, 865 F.2d at 373–74.

The court's conclusions as to the Surplus and FIT deduct and the Additional Surplus deduct were supported by substantial evidence. The court heard multiple witnesses testify that a 20-percent target rate became necessary after the 2008 financial crisis. The court noted, "In general, companies in the insurance and financial industry target—and their investors expect—post-tax returns of 12% to 25% on their capital." *Dist. Ct. Op.*, 2021 WL 1837539, at *4. Principal's actual return on capital averaged 11 percent and ranged from 5 percent to 16 percent, at the low end of or lower than the industry range. We agree with the Ninth Circuit that "ERISA does not create an exclusive duty to maximize pecuniary benefits." *Collins*, 144 F.3d at 1282. We hold that the court did not clearly err in its findings.

Fourth, Principal implemented the SES deduct to adjust for over-crediting plans for its administrative services. This deduct equaled the amount credited to the plan and participants in the form of a reduced administrative services fee. This deduct was reasonable and constituted a reasonable expense in participants' interests as pass-throughs to the plan and participants. The district court found the same to be true for the FSA Pricing Support deduct. We hold that the court did not clearly err in its findings as to the SES and FSA Pricing Support deducts because its conclusions were supported by substantial evidence. Specifically, the court relied on these facts: (1) Principal did not make any profit from these deducts, (2) the amounts of the deducts were well within the range of revenue sharing amounts for Principal's other products, (3) one witness testified that expense studies supported the SES deduct amount, and

(4) another witness testified that the amount of the deduct was appropriate as a matter of credible actuarial judgment.

The court did not clearly err in finding that Principal set the deducts in the participants' interest of paying a reasonable amount for the PFIO's administration. It also did not clearly err in finding that the CCR was set in the participants' interest. We accept both of these findings. Consequently, we hold that in setting the CCR, Principal was not "motivated by economic self-interest," *Pilkington*, 72 F.3d at 1402, and that it did not either "place its own interests ahead of those of the [participants]," *Vander Luitgaren*, 765 F.3d at 65, or "over the plan's interest," *Metzler*, 112 F.3d at 213. We affirm the court's judgment in favor of Principal on the disloyalty claim.

B. *Prohibited-Transaction Claim*

Rozo argues that Principal engaged in prohibited self dealing because it "generat[ed] revenue for itself from the plan contract." Appellant's Br. at 52. He also argues that the reasonable-expense exemption from liability for self dealing does not apply to Principal because it failed to establish that its compensation was reasonable because the deducts and the CCR were not reasonable.

The reasonable-expense exemption from liability for self dealing "must be proven by the defendant." *Braden v. Wal-Mart Stores, Inc.*, 588 F.3d 585, 601 (8th Cir. 2009) (stating that defendant has burden to prove "statutory exemptions established by § 1108"). To determine whether the exemption applies to Principal, we first determine whether Principal proved that its compensation was reasonable. The district court's holding in *Harley*, which we affirmed, suggests that compensation is reasonable if the amount was not "the result of any inflationary tactics" and the fiduciary offers expert opinion that the amount was reasonable. *Harley v. Minn. Mining & Mfg. Co.*, 42 F. Supp. 2d 898, 911 (D. Minn. 1999), *aff'd*, 284 F.3d 901 (8th Cir. 2002). Here, the district court did not clearly err in finding that the deducts—and thus the CCR—were reasonable. *See supra* Section II.A. Its findings

-13-

were supported by witness testimony it deemed credible. *See id*. We hold that Principal has met its burden of establishing that its compensation was reasonable.

We affirm the district court's judgment in favor of Principal on the prohibited-transaction claim because it is exempted from liability for receiving reasonable compensation.

### III. *Conclusion*

Accordingly, we affirm the district court's judgment.

_____